Services, Inc. Mr. Rosenberg. Thank you, Your Honors. My name is Thomas Rosenberg, Mayor of the Police Department, and I have advised that  There are three issues for this Court to consider. The first is whether there were changes in scope for Kiewit's work that necessitated change orders to be effective, or at least at the summary judgment stage where we are, did Dresser Inn meet its burden of demonstrating material facts in dispute on this issue? The second issue is whether the trial court failed to recognize Kiewit's burden to establish essential elements of its claim, namely that the reimbursable rate work and the money they seek in those three invoices for it required the prior approval of a Dresser Inn company representative, signed and authorized. And third issue, did the trial court fail to apply the correct standards in connection with the cross-motion for summary judgment on those three invoices? Taking the first issue, the trial court was correct in its decision when it said Article 303 of the contract requires a change order for any additional scope of work for which Kiewit seeks payment. The issue is whether there were changes in Kiewit's scope of work. The trial court erred when it said there were not, or that Dresser Inn failed to meet its burden as the nonmoving party in response to Kiewit's motion for summary judgment on this issue. Dresser Inn demonstrated at the court below many examples of change in scope. Probably the most abundant one was the project started as two identical 1,200-ton two-deck modules and ended up as two non-identical three-deck modules, which called for a great deal more structural steel, more piping, and more engineering work. One needs only to look at Appendix E, Kiewit's scope of work, page 2, which says the module engineer fabricator, and that's Kiewit, will furnish the following. And it says support structure for a two-deck module. The trial court said there was nothing in Appendix E to show a change in scope. Yes, there was. Kiewit's scope in Appendix E contemplated a two-deck module. Where's the line between just increased expenses? What is a change in the scope of work? I mean, it's — Very good question, Your Honor. There's a significant difference. The way the contract was set up with this multiple types of payment processes and for this reimbursable work that we're talking about, if there were material cost increases that were not the subject of a change in scope, if material costs went up, we wouldn't be here. But when we're talking about building a two-deck module and then changing that to a three-deck module with all the resulting steel, piping, engineering work, that by Kiewit's own recognition went from approximately $27 million to $42 million, that's a scope change. Now, why do we support that it's a scope change? Because the evidence at the summary judgment stage established it. You had Mike Brown, Kiewit's project engineer, who, contrary to his conclusory affidavit, wrote a letter or an e-mail to Ken DeVito of Ressouran and said the project grew by more than 20 to 40 percent more than I expected. You've got — All because of this change in the deck or the — The change in the deck and the fact that they went from two identical modules to reverse scope — reverse hand modules, we call it. I mean, the two modules had to sit on this deck of the platform, and it was determined that they could not do so as first engineered, and therefore they were reversed, and that created additional engineering work. On the other hand — Excuse me? On the other hand, everybody agrees that Kiewit had a great deal of discretion with respect to design and almost everything, as long as these modules would function as desired or as purported. Your Honor, the — So it's hard to see where the change — whether a change was a change in scope or simply a change in response to what everybody wanted, to make these things work the way they would function. Right, and we have two responses to that. First, Your Honor, there's this argument that Kiewit makes that everything was a black box. The reason Kiewit argues that is because Pemex, the owner, had performance criteria, just designed these modules to meet certain performance criteria, and that seems to have filtered down improperly to the dresser-ran Kiewit relationship. That's not accurate. Appendix E, scope of work, has a very detailed scope of work for Kiewit to perform. Second, in line with that, is you do have — this was an engineering procurement and construction contract, EPC. Kiewit took responsibility for the P and the C directly, the procurement and the construction. The engineering was delegated to its subcontractor, Accel, later called Rambo. The evidence at the summary judgment stage is that all of the engineering work was delegated to Accel. Kiewit did not establish anything at the summary judgment stage to show to the contrary. Accel comes forward with a litany of additional scope changes. You've got a great deal of dialogue. These are scope changes under their subcontract, right? But the difference being, the difference would be, if there was evidence in the record below at the summary judgment stage that showed Kiewit had to do a certain amount of work and Accel only had to do a subset of that work. That doesn't exist. What exists at the summary judgment stage here is that the engineering work, and Mike Brown says the engineering work was assigned by Kiewit to its subcontractor, Accel. So a scope change for Accel has to be a scope change for Kiewit. They had the same E, engineering, scope of work. Accel comes forward. I don't think that's true at all. This is where we have to rely upon the record at the summary judgment stage. The scope provision in the contract I read is not the same as the one in Accel's contract. The issue being is that the scope of work in the Kiewit-Dresser-Rand contract is spelled out in Appendix E. That scope of work has a litany of engineering work, procurement work, and construction work, all to support a two-deck module. And that's spelled out in Appendix E. The delegation of the engineering piece of that was entirely delegated from Kiewit to Accel. We wouldn't be addressing this issue if there was any evidence in the record below that said Kiewit had to engineer A, B, C, and D, and Accel only had to engineer A and B. That doesn't exist here, and that's why these scope changes that Accel says were all on top of its work are appropriate here. You've got deposition testimony of Michael Brown referencing emails from Eric Dixon addressing scope change. You've got an Accel record that says here's our scope growth that you've got. You've got emails going back and forth. You've got Kiewit asking Accel to create a document explaining the scope changes and put things in the bucket of what's new scope. You've got Kiewit's own president, Fuad Cesar, who writes a letter to Dresser-Rand and says this project grew more than we expected. He doesn't use them. The trial court was critical of the fact that the president of Kiewit said the project growth was much — the magnitude of the project growth was much larger than Kiewit expected. And the trial court was critical of the fact that he didn't say scope growth, but he said magnitude of the project. Well, Dresser-Rand accepted this part of the work. Dresser-Rand accepted the work. Three levels. Yes. Dresser-Rand — I don't see anything in reading the briefs and everything. I don't see anything where Dresser ever complained about there being three levels instead of two levels. Oh, you're correct, Your Honor. You're correct. They did not complain about that. Yet where we get into this is why is this scope growth important. And the scope growth is important because Article 303 of the contract says you need change orders to support it. And this is where we get into the whole issue of, yes, Kiewit came forward and said we're building a three-deck module, but there were no change orders entered into by the parties to support the increased costs, and there needed to be. The contract definition — But Dresser didn't say that at that point. Well, but it fell upon — it fell upon Kiewit when Kiewit submitted these invoices to establish their right to these invoices. The contract says in Appendix A to the contract, Section 701A, the contract price before change orders is $27.2 million. And it has the number with great specificity. It's very specific, $27.2 million. Then, right after that 701A is where you get to that chart, but it says below that this is for invoicing. And you get into that aspect of it's for invoicing purposes that you have these target estimates, and actuals will invoice. The cost there, and it says at the bottom, 100 percent, and it still adds up to $27.2 million. What's also important about this is, as the trial court stated, Kiewit acknowledged, Dresser and Rand acknowledged, this is all reimbursable work. Reimbursable work had to be supported by weekly timesheets or summaries, each authorized in advance by Dresser and Rand's duly authorized representative, and signed by that representative, and there's no evidence in the trial court to support that requirement to get paid for the work. Kiewit argues in response that this was raised on the first time at the summary judgment argument or here on appeal. And that's not entirely accurate, but regardless, as the moving party on this issue, Kiewit had to establish proof of every essential element of its claim, regardless of whether Dresser and Rand offered opposition. Fontenot v. Upjohn Company, this district, 782nd 1190, said, when the moving party bears the burden of proof on a claim upon which it is moving for summary judgment, it must come forward with evidence that establishes beyond per adventure all of the essential elements of its claim, and only when it does so does the burden shift to the nonmoving party. There is nothing in the record here that shows Kiewit met that obligation or burden to produce these preapproved, signed weekly timesheets or weekly summaries to support its argument. Lastly, the third argument, the trial court did not keep these cross motions for summary judgment separate and apart. And as difficult as that may be, because both sides filed for summary judgment on the invoices 4B, 5, and 6, it still must be done. In denying Dresser and Rand's motionó That just seems like a hyper-technical thing. I mean, whether you're right or not, what's the remedy? So we send it back, and then Judge Miller right away says, okay, well, now it's presented a correct procedure. I'll do the exact same thing. I mean, I just don't see what that gets you at the end of the day. I understand, Your Honor. I understand your comment. But, I mean, we have two things here. One, we do have error that occurred there. We do. Second, when it's our contention that the entirety of the case has to go back, and when the entirety of the case goes back, you do, again, you needóyou know, we need to hold DresseróKeywood to its obligation to show that on the reimbursable work, it met all those prerequisites to getting payment. We need to show that these were not scope changes. We are here on a summary judgment decision. And at the summary judgment stage, we have to construe those facts about the scope, the facts about the reimbursement. But these issues to the entitlement to payment, did you raise those below? We raised, in regards to the reimbursable issueó Right. I know the change order was litigated heavily below. In regards to the reimbursable issue, it is addressed on pages 76, 99, 100 of the hearing on summary judgment is where it's addressed. It's not addressed, Your Honor, in something more sufficient than the hearingóthe transcript of the hearing on summary judgment. However, Dresser and Rands submits that, again, it's their burden to show they met every element, and their failure to do so is fatal to that claim. Likewise, that's why we get into the fact that while it may be viewed as a hypertechnical argument that could be cured on remand, the fact that the Court did construe in its decision summary judgment in their favor, relying upon the arguments that were made in the summary judgment motion that Dresser and Rands filed, is another subject for review by the Court of Law. Thank you. Thank you. May it please the Court? I'm David Bland. I work for Kiewit Offshore Services. Your Honor, since this case began, what it's really been about is Dresser and Rands attempting to reallocate risks that it bargained for and negotiated heavenly. That what they're seeking from you is what they sought from Judge Miller, and that is a judicial rewrite. Rewrite the scope of work. Rewrite the change order provision. Rewrite the payment conditions of the contract. With respect to the scope of work, Your Honors, that was heavily briefed and addressed by Judge Miller. And succinctly he stated, and this is the crucial sentence we believe in the judgment, in its motion, Dresser and Rands fails to identify any section of Appendix E that was altered throughout the course of the project. In fact, it provides no detailed analysis of Appendix E at all. Appendix E was a performance spec. It was a criteria handed down from PMEX. PMEX wanted a solution. They had an existing structure in the Gulf of Mexico. They had two compressive modules to a performance spec that they wanted delivered. And Dresser and Rands hired Kiewit Offshore Services down at Ingleside to engineer, fabricate, and install, deliver, that is, Your Honors, these modules. There was no specification about two or three. We could have put six. It was completely up to our discretion how we would perform the work. The design evolution was just that. It was an iterative process. It took time. And the reason the contract was priced the way it was is originally, and this is in the record, Dresser and Rands reached out to Kiewit for a lump sum contract. And they gave them this performance spec. And Kiewit said, I can't do that. I'll give you hybrid pricing. Where Dresser and Rands went wrong, and really the heart of the matter, is that they had a lump sum contract with PMEX. They had a hybrid contract with us. And that's where they went wrong because they couldn't flange the two up. They had to pay us more than they were going to get from Dresser and Rands. And that's the bottom line. That's not a legal argument. That's commercially what happened. And what happened, Your Honors, is that we gave them a price structure that was time and materials, unit rates, cost plus, and a piece of lump sum. It's all in the contract. We even excerpted it into the brief. And that's how we invoiced it. The contract was set up in such a way that we would perform the work. There was a target estimate with approximate milestones. That's in the contract. Those are not my words. The target estimate of 27 would later be trued up through invoicing how we perform the work. And that's what we did. For each invoice, we would provide our backup, time and material, unit pricing, the lump sum piece, which was billed on a milestone basis. It was fixed. We never went over it. And we would give them that. We handed them our daily time sheets. They signed off on them. That's in the record. And I'll get to the preceding argument in just a moment. But as we went along in the course of the project, the way the matter was administered is that we would send an invoice. They paid it. They paid the first four, which is in the record. And now we're at $33 million, which was $6 million over the target estimate. No one made a complaint. When we sent our fourth invoice in, 4B, that's when abruptly and for no reason they stopped paying. But parenthetically, it was because they realized they were over budget, and so they quit paying us. We continued to work, and we delivered. Each and every invoice was submitted and the time sheets approved. With respect to inferences and weighing evidence, Your Honors, what happened at the summary judgment stage is that Judge Miller carefully looked at the evidence. And what was it? It was evidence from the Kiewit president, sort of a bird's eye view, in which he said the plan changed. And as Judge Miller pointed out, that just means it grew beyond what we thought. It kept going and going and going while we engineered it and built it. It didn't say the scope of work in Appendix E changed. What Dresser ran needed to do at the summary judgment stage, which they failed to do, is show me a drawing, show me a specification, show me where PMEX changed the compression module criteria, because that's all we had. Give me an output for the modules.  What about the two-deck, three-deck issue they raised? It's a complete red herring. Your Honor, if you look at Appendix E. I've got it right here. Support structures for two-deck module with interface. And that's the way the procurement was issued. When we issued the procurement, Judge Costa, the module was originally, literally it was a sketch, and this is in Mike Brown's deposition, of how we would try to do it. And as the iterative process continued, there was no change order to take it from two to three or anything like that. They went and collaborated with one another. It was a corroborative process. This is how we can get it in this space. And we worked together, we meaning Dresser ran and Kiewit, to get it in there. But it wasn't a change to the output of the modules, which is all we had. So where is that line? That's what I don't quite understand. Obviously things are constantly changing. What crosses over the line of a change in the scope? Your Honor, with a contract like this, which is this criteria, an in-solution is what PMEX wanted, in order to show that change, there would have to have been a change to the criteria. We didn't have design drawings. This wasn't like giving you a design drawing of this building and we move the bench four feet and that's a change order. Here it was an output criteria. To answer your question, Judge Costa, in order to show that to be a change in Appendix E, PMEX, through Dresser ran, would have had to say, you know what, I want a higher output or I want a different output. I want a different result. And that never changed. And Judge Miller repeatedly pointed it out in both sections of both cross motions of summary judgment. Is there evidence that Dresser agreed to a change or evolution, whatever you call it, from a 2 to a 3 level? Yes. Yes, Your Honor. It's in the depositions that are in the record. But it was, frankly, it was sort of a no-moment thing. This is how we have to do it. But there wasn't evidence in terms of a contract document like a change order. But there was evidence of an understanding that it was necessary or desirable to go to the 3 level by Dresser? Yes, as the design evolved. Now, where would I find that in the record? Your Honor, it would most likely be in the deposition of both Mike Brown, who was our program manager, and Ken DeVito, who was Dresser ran's program manager. And that's as best I can recall on that issue. I take it you would say there's nothing in the record to show that anybody for Dresser objected when the 3rd level started appearing on the project or however you, nobody said, hey, what's that 3rd level doing up there? Of course. There was not, and also they didn't say, wait a minute, that's a change. You need to issue me a change order. If we're going to go from 2 to 3, this idea of a change order, frankly, was never mentioned until us lawyers got involved. When they administered the contract between them, there was certain change orders issued. For example, there was a change order for a new lifting mechanism to lift the structure off the barge and onto the structure, onto the fixed platform in the Gulf. And both parties knew that that was a new scope of work. So they issued a change order. Another thing that Dresser ran repeatedly relies on is this idea of the Excel changes. Most of their brief is dedicated to this idea of engineering changes. A simple reading of these two contracts demonstrates patently that they are different scopes of work, different change order provisions. The Excel contract required a change order for any change, any change in fee, anything. Our change order provision is much more limited, and it doesn't include increased scope of original work. Ken DeVito, the program manager, during the course of the job, admonished on more than one occasion, it's in the record, it's in writing, admonished Kiewit don't send me change orders for increases in the engineering work for the original scope of work. I'm not going to sign them. Don't give them to me. That was his instruction because he believed and understood that the engineering process for this performance criteria contract would grow and that those increased costs was a risk Dresser ran assumed. Who was that you said? Ken DeVito, Your Honor. And we cited both his emails and his testimony on that point. Do not give me change orders for engineering work increases for the original scope of work. Judge Miller took on board the testimony from Excel, and what Dresser ran failed to do and still fails to do here is correlate increases in the Excel work to a change to Appendix E. They're different things. Appendix E is my scope. The Excel scope was a list of drawing deliverables which were attached to the contract. From piping drawings to structural drawings, you will issue these. They're listed in their contract. All I have is a performance criteria. Judge Jennings, I think you pointed this out earlier, that a simple read of the contracts demonstrates that they're not the same thing and that a change or a growth in Excel doesn't somehow metaphysically get you to a change in our contract with Dresser ran. One thing I'd like to address briefly is this condition precedent argument. It is true that it was raised for the first time at oral argument and then later in this reconsideration motion at the district court level. It wasn't briefed before Judge Miller until reconsideration, begging the question of what was being reconsidered if they didn't raise it to begin with. But putting that aside for the moment, this clause that they rely on, which is 701 Appendix A, Note Little Roman No. 5, and all it says is that your invoices will be supported by weekly timesheets and summaries authorized by the company representative. On its face, as a matter of Texas law, that is not a condition precedent. It is not conditional language such as if, except, or until. And as you all are very familiar with, the Texas Supreme Court has said more than once that, quote, due to their harshness in operation, conditions precedent are not favorites of the law. And here there's just no conditional language, as you see in some of the Texas cases that address this point. But tellingly, when the parties, particularly Dresser-Rand, wanted to put conditional language in the contract, they did. In fact, Your Honors, if you look at the contract, the main body of the contract, at page 10, Article 701, with respect to the last payment, it says this. Payment of the final invoice is, quote, conditional upon lien waivers, which is a typical concept in a construction contract. But that doesn't turn up with respect to our invoices for milestones throughout the project. As a matter of law, simply stated, that's not a conditional precedent. Counsel, let me follow that argument, but let me direct your attention back to the three invoices, the 04, the 05, the 06. Can you, in a sort of shorthand, tell me what described that nature of that work, the subject of those invoices, which are the ones at issue here? Yes, Your Honor. If you look at the invoices, which are attached to Mike Brown's affidavit, the way the project was invoiced was this. There would be a summary sheet, and then behind it was the categorization of the work. The category of the work, which is page two of each invoice, mirrors Appendix E. Appendix E, Table 1, is your pricing mechanism. So on there it will say, for example, lump sum for this amount, for that milestone. It will say engineering, and it will be the actual spent during that time period. So it tracks, if you will, the procurement, the T&M piece, the cost plus piece, and then it gives you your invoice. The invoice will say, for example, current project price $30 million, this invoice $2 million, and behind it is the makeup of that. And then behind that were thousands of pages of timesheets and invoices. And there were footnotes, Your Honor, in the category page. That describes, I think, adequately to me the way in which you were keeping the records, et cetera. I was trying to visualize the nature of that work, in particular how that differed from the work that had gone before. As I understood this contract, you were going to try to make this thing work and engineer it so it would work. And I assume, for example, that they multi-tiered, two-tiered, whatever, was a byproduct of the space considerations. Once you start putting together and engineering it, you're going to have to go up another level, et cetera, that kind of dynamic that's here. What I'm trying to get in my head is what was really going on that produced those invoices. I don't know what that was. Ultimately, I'm trying to visualize how that differed from the earlier invoices in terms of the nature of the work. They didn't, Your Honor. So if you start with Invoice 1, the first approximate milestone, it gives you your same categories. And obviously with Invoice 1, your engineering activities are going to be more heavy because you're not fabricating yet. And so you get your disciplines of work, as they call it in Table 1 of Appendix E. You have those, and you show what occurred during the time period. There were five of them. And so each discipline shows what occurred during that time period, including order and steel in the beginning, engineering. And then as you go along to Invoice, say, 5, 6, 7, the engineering work died down and you're doing more of your fab work. So it just tracked the target estimates, the approximate milestones for each level of work. I hope that answers your question. But the disciplines in the invoice format didn't change. The work that's reflected in those is just a truing up of the actual work that occurred during the time period. And the invoices mirror the contract. If you look at the footnotes in the category section, it will say actuals incurred this time period and that sort of thing. So 4, 5, and 6 were not limited to the third level? No, Your Honor. No. The third level idea was purely on paper. It was an engineering evolution. It never wasn't a fabrication thing because when we started building it, the design was now complete. But when they were, as Judge Higginbotham pointed out, when they were trying to fit this thing in to an existing structure, they realized that originally, just a factual point, they couldn't access it to maintain it was the problem. Bit of a problem. Yeah. So in their offshore Mexico. So they changed it for an access issue to be able to work on it in the Gulf. With respect to the late complaint, if you will, that's raised for the first time on appeal about the sufficiency of our invoices, that was never raised at the trial court level. We had Mike Brown's affidavit, which presented the invoices, and also his affidavit went on to explain how the invoices were made up in paragraph 9 of his affidavit. He explained the procurement piece, the engineering piece, the lump sum piece, and how the invoices were put together. But moreover, Your Honors, we would suggest that that argument about the sufficiency of our evidence was something that Judge Miller specifically found in addressing both motions, that the invoices were undisputed, that Dresser and Rand never raised an issue about the sufficiency of our evidence. They never objected to one piece of our evidence, didn't file a countervailing affidavit on any point, including the scope of work change. And tellingly, going back just for a moment to the scope of work idea, there were eight depositions from Dresser and Rand, eight from Kiewit. And what is lacking completely in the Dresser and Rand brief and argument is any testimony from Dresser and Rand itself that the scope changed. Not one witness, not one affidavit. We cited their testimony. We relied on it because they all said it didn't change, and I put it in the brief. But what's telling is that they simply could have had an affidavit or something to raise an issue that criteria changed or performance spec changed or work changed, but instead they relied primarily on changes to the Excel scope, which is an entirely different matter. So your position is that there was no breach by you, so we should affirm. I was concerned that we might be getting into a situation where we have an ambiguous contract and we're going to have to worry about whether it is ambiguous and whether we can look at all this parole evidence or we send it back for that or what. But your position is we're not getting to that. We're not there. In fact, amongst the few things we agree on, it appears that Dresser ran and Keywood agreed that the contract was unambiguous because neither party went in that direction, Judge Dennis, in front of Judge Miller or in front of you all in terms of raising ambiguity to the contract itself. Earlier in the case, Dresser ran, pressed this idea that it was a lump sum contract. But once we got to the summary judgment stage, they backed off that, which was in their pleadings and in their complaint against us. They moved away from that and then went to this change order direction. Thank you, sir. I've extended your time a little bit, but I will also extend Mr. Rosenberg's time an equal amount. Thank you very much, Your Honor. Mr. Rosenberg, I have a couple of questions with regard to these invoices 4, 5, and 6. A change order to me contemplates that you have a base, right? Yes, sir. We're building a house, and we said it's going to be a two-bedroom house, and then Mama said, no, I want another guest bedroom. And so now you've got to change the contract, a change order. But the difficulty, obviously, in this case is that your counsel opposite describes this as a the original conception of this thing contemplated a dynamic engineering project. And there is no base, if you will, under that scenario. They're doing the work that is necessary in order to get this particular it's not an off-the-shelf item, but anyway, to make this item work. And so I'm looking for where is the deviation? Where is the change from? Yes, Your Honor. And there were, the record is clear, there were seven invoices, although we are talking about a lot more than there will be. Right, right. Seven was this last one. It's $41,000 for rigging and getting the modules onto the platform. So these are the last three invoices. Right. This is where the bulk of the work is done, and it brings in all that additional scope change of going from the two-deck to the three-deck module. I'm suggesting to you scope change, in a sense, but you're calling it that doesn't really answer the question, because it presupposes that there is a defined scope. If the defined scope is simply that you were going to do the work that is necessary, the engineering work and so on and so forth, to conform this project, then it seems to not have difficulty. Yes, sir. You're looking back at the original spec sheet, and nothing changes about that. Appendix E, Appendix E, Module Engineer Fabricator Equipment Scope. Right. The Module Engineer Fabricator, and that's key, will furnish the following. Major equipment and systems completely engineered, fabricated, assembled into a single lift module, which is one of the two modules. It will be inclusive of support structures for a two-deck module. That's the scope of work. So when you change that and you go from analogous to, as the court just indicated, building a house, if I tell the builder I'm going to pay him on a time and material basis for a two-story house and he gives me a six-story house, he has changed the scope. Their argument is this could have been six decks, ten decks, a hundred decks, and dresser in would have to pay whatever it is. Look, do these particular invoices relate strictly to the cost that's incurred by the difference between the additional deck? The way the invoices were presented, it says this is everything we've done, and pay us, is the way they were presented. And that's what we have in the record. The record isn't as developed as one would like for this, and it's one of the reasons why we contend these are such fact issues that we need to go back. But what we do know is that it's these three invoices, it's the crux of all the work, that makes up the issues that are currently in dispute. Well, if the engineering judgment is that with two decks you can't have access to that, but the assignment is to make this work, give us the product that will work in this rig. But that's where what Kiewit should have done is said to give you the process, to give you what needs to work on this rig, that's a change in our scope. We now have to do X, Y, and Z that we didn't have to do before, and therefore we're entitled to additional payment. Well, I'm suggesting to you the argument is that what you wanted was an end product that worked, and they were making the end. That's not a matter of changing, because changing presupposes. The only thing you can point to in concrete terms is additional deck itself. And there are no suggestions. I don't know if these invoices relate to that cost that's incurred. And that's why the record isn't developed and why summary judgment wasn't developed. Well, you're a burden. Everybody wants a product that works. The question here is did they follow the contract in doing so? And the contract provisions specifically say Appendix A. Well, your old people said they did. Appendix A, but when we're talking about payment for work here, Appendix A says in 701A the contract price is $27.2 million, and then you get into the fact that if it is a change in scope, you have to follow the contract. Opposing counsel indicated that there was no objection by Dresserand to that. He just said that's not accurate. Dan Simpson said, and that's a senior management person from Dresserand, he said and it was pointed out that they failed to follow the contract change process. That's why we're here. They also said that this whole issue of the reimbursement work, it was just said to the court that all the contract called for was timesheets authorized by a company representative. That's not accurate. What it says here, it says reimbursable rate-driven scope, and this is section 703, I'm sorry, 701A, small little five. Reimbursable rate-driven scope will be supported by weekly timesheets, timesheet summaries, each authorized in advance by company and confirmed as accepted for payment by signature of a duly authorized company representative. That was just left out a few minutes ago. Each signed in advance, each authorized for payment. Why? So we don't get into this situation where one party thinks it's getting something for $2,700. But what's required to be approved in advance by the language? The weekly timesheets or timesheet summaries. That's what it says. The key to that is in a way. You're suggesting that before they do the work, they've got to get clearance for it. Yes, because that's the money tracking mechanism. So that dresser ram isn't faced with thinking what they're buying is $27 million, and as we add here, they get something that they're charged $42 million for. That's why this provision is in here and why that's such a significant provision to this. Therefore, the problem we have here is that this case was not ripe at that point for summary judgment. The case needs to be moved for summary judgment because they failed to deal with the change in scope. The court said where is the fine line? Where is the fine line on the scope? I think that's a fact question, and I think that's a question that has to go back, and why this Court should remand it back to the trial court. How is a trial of fact going to determine that? I'm sorry, Your Honor. How is a trial of fact going to determine what the line is? Counsel. I think what happens is the trial of fact in this case, here's all the testimony. Let's put it this way. It's the old Rule 49 inquiry. That's the presupposition we have of a jury. You have to oscillate the issues even in the bench trial. And that is, did the plaintiff prove a preponderance of evidence there? And then what is going to be the question you're going to ask them? Does it exceed the scope? I mean, what question do you ask? What is the state for me the question that's determined? I think the burden here is, I mean, to the extent they're seeking payment, the burden is to show that it was all within the scope, to the extent we are seeking to preclude payment. Now, my question is, you said there's a question of fact here. And my question is, then, what is that question of fact, issue of fact, that a trial of fact is going to answer? As best I can . . . Well, how would you formulate it under Rule 49? That's the old standard test. Even for major trials, I ask the counsel, you tell me before we start the darn case, what do you think you're going to ask the jury, even if it's a bench trial? That is a way of sorting things out. And I'm not hearing what you formulated. What the trial court will be faced with is answering the question, the original scope that was set forth in Appendix E, is that the scope of work that was delivered by Kiewit? If it was not the scope of work delivered by Kiewit, then you've got to change in scope. Appendix E is captioned scope of work. It sets forth in great detail what was to be done. And it's comparing that document to the final product and seeing if we have two different things. Dresser-Rank intends we do. Dresser-Rank intends that's a fact question for the trial court. Thank you. Thank you, Your Honor. Thank you, sir. We'll take the final one. No, let's take a break.